IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| VERIS HOME TECHNOLOGY LLC by itself and as assignee of SPEMOT AG, AXISS AUDIO USA LLC, and AXISS DISTRIBUTION INCORPORATED (together d/b/a AXISS AUDIO) | |
| Plaintiffs | Case No. 3:26-cv-00918 |
| v. | District Judge Waverly D. Crenshaw, Jr. |
| MICHAEL BOVAIRD, MICHAEL GEFTEAS, FLORIAN WIEGAND, SUNCOAST AUDIO LLC, LUXURY HI-FI DISTRIBUTION LLC, and CLARISYS AUDIO GLOBAL DISTRIBUTION, LLC, | Magistrate Judge Luke A. Evans |
| Defendants. | **JURY DEMAND** |

---

**AMENDED COMPLAINT**

---

Plaintiffs, by and through their attorneys, bring this Complaint against the above-named Defendants, and state the following in support thereof:

**INTRODUCTION**

1. Plaintiff Veris Home Technology LLC ("Veris") is the parent company of AXISS Audio USA, LLC ("AAU") and AXISS Distribution Incorporated ("ADI"). Veris and AAU are operating companies, and ADI is a passive holding company, that together do business as and are well-known in the audiophile community as AXISS Audio ("AXISS"). AXISS is one of the largest importers and distributors of high-end audio Hi-Fi equipment in the United States.

2. AXISS is the exclusive importer and distributor of more than fifteen high-end audio Hi-Fi brands including Accuphase, Soulution, Gauder Akustik, Franco Serblin, and more.

3. Since 2023, when new ownership took over and made meaningful investments of time and capital, AXISS has made substantial operations improvements which have resulted in sales growth of over 300% on average for each of the AXISS brands.

4. Among AXISS's brands is Soulution Audio ("Soulution"). Soulution is owned by Spemot AG ("Spemot"), a Swiss company. Spemot has assigned all of its assignable claims for damages within AXISS's exclusive territory against Defendants in this lawsuit to Veris.

5. The Absolute Sound ("TAS," the largest high end Hi-Fi media company) has awarded more Product of the Year awards to Soulution since its launch in 2006 than to any other high-end Hi-Fi electronics brand. In 2026, as explained in more detail below, Soulution's 717 power amplifier received numerous awards and extraordinary accolades that should have led to significant sales for AXISS.

6. But Defendants' actions, including multiple breaches of contract, numerous instances of defamation and slander, numerous instances of misrepresentation and deceit causing injury to property via falsehood, violations of the Tennessee Consumer Protection Act, and repeated instances of intentional interference with AXISS's and Soulution's contracts and business relationships derailed AXISS's sales and tarnished Soulution's reputation in the high-end Hi-Fi industry.

7. Fundamentally, this case is about three individuals and associated businesses who breached contracts then set out to destroy AXISS, a Tennessee-based business, by defaming, slandering, misrepresenting, engaging in deceit, and otherwise intentionally harming AXISS's business relationships and reputation and the reputation of the products it sells so as to destroy a

competitor, destroy the value of property, and seek vengeance against a company that refused to pay amounts demanded.

8. Defendant Suncoast Audio LLC ("Suncoast"), which is owned by Defendant Michael Bovaird ("Bovaird"), severely mishandled a sale of Soulution products to a prominent customer in breach of its contractual obligations to AAU. Then, rather than owning up to its mistake, Suncoast and Bovaird blamed AXISS and sought to put the cost of their mistakes on AXISS through a series of false and damaging stories, all of which was in further breach of Suncoast's contracts with both AAU and ADI.

9. On information and belief, Defendants Bovaird, Suncoast, Florian Wiegand ("Wiegand"), Luxury Hi-Fi Distribution LLC ("Luxury"), and Clarisys Audio Global Distribution, LLC ("Clarisys," and together with Bovaird, Wiegand, Suncoast, and Luxury the "Bovaird Defendants") have been compensating Defendant Michael Gefteas ("Gefteas")—a professional promoter and reviewer of Hi-Fi products who operates as "The Greek Audio Geek" on Facebook and YouTube—for product reviews.

10. Gefteas operates the Bespoke Audio Shop ("Bespoke") as a sole proprietorship, website, and a consulting service that connects purchasers of audio equipment to dealers. On information and belief, Gefteas conspired with the Bovaird Defendants to take the actions alleged in this lawsuit to benefit himself through illegal means at the expense of AAU.

11. Gefteas has repeatedly published false and damaging stories about AAU and Soulution and has shared confidential information he could have learned only from the Bovaird Defendants.

12. Gefteas did this in violation of a non-disparagement agreement with AAU and continued spreading false, damaging, and disparaging statements for months after he was directly informed that the information he was sharing was false.

13. On information and belief, Gefteas has been compensated by the Bovaird Defendants to publish false, damaging, and disparaging stories.

14. Gefteas has been highly critical of AXISS and Soulution and laudatory to Suncoast, Luxury, and Clarisys. Clarisys is owned by Bovaird and Florian Wiegand and is a manufacturer of high-end Hi-Fi audio speakers that competes with speakers brands that AXISS distributes. On information and belief, Gefteas has been compensated by the Bovaird Defendants to publish positive reviews of Hi-Fi products sold by Suncoast and imported and distributed by Luxury, including Clarisys which is owned by Bovaird and Wiegand.

15. Bovaird owns Suncoast, Luxury, and (together with Wiegand) Clarisys and engaged in contract breach, defamation, slander, misrepresentation and deceit against AXISS and its products—and conspired with Gefteas for him to defame and engage in misrepresentation and deceit against AXISS and its products—in order to intentionally interfere with AXISS's relationship with Soulution so as to destroy AXISS as a competitor, damage the reputation of its products, injure the value of its property, and tarnish the reputation of Soulution as a preferred high-end Hi-Fi brand in the industry.

16. Via its owner, Wiegand, and a Tennessee-based employee Clarisys engaged in defamation. slander, misrepresentation and deceit against AXISS and its products—and conspired with Gefteas for him to do the same—in order to intentionally interfere with AXISS's relationship with its brands, such as Soulution and Gauder Akustik, so as to destroy AXISS as a competitor,

damage the reputation of its products, injury the value of its property, and tarnish Soulution as a preferred Hi-Fi brand in the industry.

17. The defamation, slander, and misrepresentations were injurious falsehoods that damaged property in Tennessee for which Gefteas and the Bovaird Defendants are liable directly and as conspirators.

18. The contract breaches, defamation, slander, misrepresentations, deceit, injurious falsehood, and intentional interference with AXISS's business and contract relationships by the Bovaird Defendants and Gefteas are part of a civil conspiracy among all Defendants to harm AXISS and benefit all of the Defendants.

19. Defendants via their actions and conspiracy have caused millions of dollars of economic harm and immense reputational harm to AXISS.

20. Defendants via their actions and conspiracy have caused substantial economic harm to Soulution and its property.

21. Plaintiffs seek monetary damages to compensate for their losses as well as judgment from this Court to restore their reputation after the many falsehoods Defendants have intentionally injected into the high-end Hi-Fi market.

**JURISDICTION AND VENUE**

22. This is an action between citizens of different states where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332. Veris is a Tennessee limited liability company with its principal place of business in this district. All of Veris's members are citizens of Tennessee. Defendants Suncoast, Luxury, and Clarisys are Florida limited liability companies with their principal place of business in Florida, and on information and belief no members of Suncoast,

Luxury, or Clarisys are citizens of Tennessee; Defendant Bovaird is a Florida citizen; Defendant Wiegand is a Swiss citizen; Defendant Gefteas is a Texas citizen who also does business as Bespoke.

23. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this district and because a substantial part of the property that has been damaged is located in this district. In fact, this district is, by far, the district most touched by the events alleged in this action. The vast majority of contract and statutory breaches and torts occurred in whole or in part in this district; Defendants directed their harm toward this district; and the property harmed by Defendants is located in this district. Each AXISS entity has its principal place of business in this district. Defendants Bovaird, Gefteas, and Suncoast all contracted with AAU in this district and breached those Tennessee-based contracts. Defendants' torts were all directed at AAU, AXISS's principal operating entity, in this district, including their intentional interference with AXISS's business relationships. Defendants injured AAU and Soulution's property located in this district. Parts of the conspiracy were conducted by an employee of Luxury and Clarisys located in Tennessee who engaged in activities in this district because Defendants Bovaird and Wiegand placed calls and sent emails into this district to spread false information and instruct that employee to take illegal actions.

24. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because more events or omissions giving rise to the claims in this lawsuit occurred in this district than any other district in the country and all Defendants are subject to personal jurisdiction here whereas no other judicial district is likely able to assert personal jurisdiction over every defendant.

25. This Court has personal jurisdiction over Defendants pursuant to Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-223, because Defendants transacted business in this state, caused tortious injury to Plaintiffs by act or omissions in this state, violated statutes and thereby caused harm to Plaintiffs in this state, and/or caused tortious injury outside of this state while regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods used or consumed or services rendered in this state.

26. Specifically, and by way of example, as detailed further below, this Court has personal jurisdiction over every Defendant because:

(a) Defendant Bovaird executed contracts for Suncoast repeatedly with AAU (a Tennessee LLC) in this state to be performed under Tennessee law, repeatedly sent payments to AAU in this state, contracted directly with AAU at least four times on matters pertaining to this dispute and breached two of those contracts with AAU as alleged herein, hired and manages an employee of Luxury and an agent of Clarisys who resides in and works in this state, interacts with that employee and pays him in this state regularly, and engaged in a conspiracy directed at Plaintiffs in this state that included Luxury/Clarisys and their employee/agent in this state.

(b) Defendant Gefteas contracted repeatedly with AAU and Veris for contracts to be performed under Tennessee law, sent payments and shipments to Tennessee, received shipments of goods from Tennessee as part of the contracts he entered into with Veris and AAU in this state, threatened an employee of AAU in this state to receive another contract from AAU and then breached that contract with AAU and made good on his threat by directing false statements,

misrepresentations, deceit, and defamation against AXISS in this state in an effort to intentionally interfere with AAU's business relationships in this state, injury AAU and Soulution's property in this state, and as part of a conspiracy directed at Plaintiffs in this state.

(c) Defendant Suncoast contracted with AAU in this state for contracts governed by Tennessee law, sent payments to AAU in this state, received shipments from AAU from this state, breached contract with AAU, and is part of a conspiracy directed at Plaintiffs in this state.

(d) Defendants Luxury and Clarisys each conduct substantial operations from this state via their employee/agent Dave Weintraub who lives and works out of Nashville, Tennessee. On information and belief, Mr. Weintraub is an employee of Luxury who also is contracted to serve as the head of sales in the United States for Clarisys, via Luxury, from Nashville TN. Luxury engages with its employee in Tennessee on a regular basis and sends payments into Tennessee to compensate its employee. Mr. Weintraub is an agent for Clarisys as he handles all sales of Clarisys products in the United States via Luxury. Clarisys engages with its agent in Tennessee on a regular basis. Luxury and Clarisys participated in the conspiracy alleged herein, including in Tennessee by instructing Mr. Weintraub to place phone calls from Tennessee to AXISS dealers slandering the Soulution products and intentionally interfering with AXISS's business relationships with its distributors as well as injuring the property of AAU and Soulution in this state via falsehood.

(e) Defendant Wiegand engaged with this state every time he engaged with Dave Weintraub, Clarisys's sales agent who operates out of Tennessee.

Defendant Wiegand directly touched Tennessee as part of the torts and conspiracy alleged here when he spoke with or otherwise instructed Dave Weintraub, Clarisys's sales agent in Tennessee, to speak via telephone from Tennessee with a distributor in Utah to encourage that distributor to drop the Soulution products based on information that was false or at a minimum misrepresented or was deceitful about the products. Mr. Wiegand also participated in the conspiracy alleged herein and directed torts and injurious falsehood against Plaintiffs and their property in Tennessee and interfered with AAU's business relationships centered on this state.

27. An actual and justiciable controversy exists between Plaintiffs and Defendants.

**THE PARTIES**

28. There are three companies who together do business as AXISS Audio ("AXISS").

29. Plaintiff Veris Home Technology LLC ("Veris") is a Tennessee limited liability corporation with its principal place of business in Nashville, Tennessee that operates entirely from Tennessee. Veris's members are all citizens of Tennessee. Veris is the parent company of AAU and ADI. Veris is also an operating company that handles repair services and makes direct sales of used and vintage products to end users that it purchases from AAU. For example, Veris contracted directly with Defendant Gefteas who paid Veris in Tennessee for audio equipment that Veris shipped to Gefteas from Tennessee.

30. Veris owns all of the stock and controls all property and rights of AXISS Distribution, Inc., ("ADI"). ADI is a California corporation with its principal place of business in Nashville, Tennessee. ADI ceased doing business as an operating company by the end of 2024. Today, ADI is a purely passive company that holds certain contract rights but owns no property

and conducts no transactions. Rather, as explained below, AAU is the operating company that conducts most of the business affairs of AXISS. ADI was in the process of winding down operations when AAU first contracted with Gefteas, but all of the legal causes of action asserted in this complaint arose after ADI had ceased operations.

31. Veris owns all of the shares and is the sole member of AXISS Audio USA, LLC ("AAU"). AAU is a Tennessee limited liability corporation with its principal place of business in Nashville, Tennessee. AAU is the operating company that does the work of AXISS and effectively replaced ADI as an operating company. When people in the audiophile community, including Defendants, speak of "AXISS" they are referring almost always to AAU, since AAU is the company that does all of the work people think of as the business of AXISS. AAU has ten employees, eight of whom are located in Tennessee. AAU imports its exclusive products, including Soulution products, from manufacturers into Tennessee; holds those products in its warehouse in Nashville, Tennessee; and ships the products from Tennessee to dealers around the country. Each shipment is governed by a purchase order followed by an invoice that is a separate contract made by dealers with AAU whereby the dealers contract with AAU in Tennessee, pay AAU in Tennessee, and receive shipments of products that AAU sends from Tennessee. For example, as alleged in greater detail below, Defendant Suncoast has repeatedly contracted with AAU in Tennessee, paid AAU in Tennessee, and received shipments from AAU from Tennessee. Defendant Gefteas likewise repeatedly contracted with AAU in Tennessee.

32. Veris is also the assignee of all assignable claims Spemot has against the Defendants for damages and other relief related to Soulution-branded products within the United States and Canada, which is the exclusive territory served by AXISS. Veris therefore brings this

action both in its own capacity and as assignee of Spemot and seeks damages on behalf of Spemot for all damages Spemot sustained from Defendants within the United States and Canada.

33. Defendant Michael Bovaird is an individual residing in Sarasota, Florida. Bovaird owns Defendants Suncoast and Luxury and has an ownership interest in related party Clarisys.

34. Defendant Suncoast Audio, LLC ("Suncoast") is a Florida limited liability corporation with its principal place of business in Sarasota, Florida. On information and belief, the members of Suncoast are Florida citizens, and no member is a citizen of Tennessee.

35. Defendant Luxury Hi-Fi Distribution, LLC ("Luxury") is a Florida limited liability corporation with its principal place of business in Sarasota, Florida. On information and belief, the members of Luxury are Florida citizens, and no member is a citizen of Tennessee.

36. Defendant Clarisys Audio Global Distribution, LLC ("Clarisys") is a Florida limited liability corporation with its principal place of business in Sarasota, Florida. On information and belief, the members of Clarisys are Florida citizens or citizens of Switzerland, and no member is a citizen of Tennessee.

37. Defendant Florian Wiegand is a Swiss citizen and co-owner and Manager of Clarisys.

38. Defendant Michael Gefteas is an individual residing in Frisco, Texas. Gefteas reviews and promotes high-end Hi-Fi equipment under the name The Greek Audio Geek. Gefteas also operates Bespoke Audio Shop, which is not a separate legal entity.

## FACTUAL ALLEGATIONS

### AXISS and Soulution Build a Successful Partnership

39. AXISS is the successor company to ADI, which was founded in 1993. As alleged above, AAU now handles all of the operations that used to be handled by ADI. Since 1993, AXISS, first as ADI and now as AAU, has been an importer and distributor of top-tier Hi-Fi equipment.

40. Today, AXISS represents more than 15 top brands like Accuphase, Soulution, Gauder Akustik, Franco Serblin, and more.

41. AXISS is owned primarily by Cliff Duffey, who is the largest shareholder of Veris. Other shareholders include Mrs. Duffey and another individual, all of whom reside in Tennessee. There are four additional investors, all of whom also reside in Tennessee.

42. Mr. Duffey is a passionate audiophile and successful entrepreneur who founded and led an Internet security software company for over twenty years. Mr. Duffey is a small business owner based in Nashville, Tennessee who brought his years of business experience and put his own time and capital at risk to acquire and revitalize AXISS.

43. Since the purchase in 2023, the new ownership of AXISS has made substantial operations improvements which have resulted in sales growth of over 300% on average for each of the AXISS brands.

44. The new ownership also wound down all operations in California and moved all AXISS operations to Tennessee. All operations of AXISS are now run by AAU out of Nashville, Tennessee (except for repair services and direct sales of used and vintage products to end users which are sold through Veris).

45. In general, AXISS does not sell direct to consumers. It is a pure wholesale distributor to retail Dealers who are themselves specialists at installing and supporting high end Hi-Fi products for passionate audiophile customers.

46. These sales are conducted by AAU via purchase orders and invoices under Tennessee law. Dealers have also agreed to follow certain requirements set out in a standard Authorized Dealer Agreement that AXISS's Dealers have agreed to follow.

47. The one exception is when Veris sells directly to a limited number of end-users. For example, as alleged below, Veris sold heavily discounted demonstration products to Gefteas as part of a contract between Veris and Gefteas that Veris agreed to enter following Gefteas's completion of a contract he entered into with AAU.

48. Many Hi-Fi distributors in the United States provide import and logistics services with some small amount of advertising and sales support for their Dealers, but AXISS goes much further by working as an outsourced extension of the manufacturers it imports and distributes. AXISS owns responsibility for all operations, marketing, product support, service, and repair for its Dealers and customers in the United States and North America.[1] This allows AXISS's brand partners to focus solely on their technology and manufacturing while outsourcing everything else to AXISS, and the comprehensive outsourcing approach has been a key differentiator and a driving reason behind the success of AXISS's stellar reputation in the industry and coinciding sales growth.

49. Today AXISS is one of the largest high-end Hi-Fi importers and distributors in the United States. Its sales growth has exceeded 300% since 2023. Before the events giving rise to this

[1] As explained below, warranties for the products AXISS imports and distributes are provided by the manufacturers.

lawsuit, AXISS was seeing uninterrupted sales growth. Prior to the actions of Defendants alleged in this lawsuit, Soulution was AXISS's most successful brand.

50. Soulution Audio is a subsidiary business of the Swiss company Spemot. Since around 1960, Spemot's primary business has been to build high quality electric motors, mostly for special application purposes.

51. Starting around 2005, Spemot launched Soulution as a new subsidiary business. Spemot's goal was for Soulution to build the highest performance audio electronics possible, with cost as no object, leveraging the experience that Spemot had developed in advanced electronics engineering.

52. Today Spemot and Soulution operate from their factory office in Dulliken, Switzerland with an estimated 60 employees.

53. The results for the Soulution products have been extraordinary. Since the launch of its first products, reviewers and customers have hailed Soulution as one of the best manufacturers of high-end Hi-Fi audio electronics in the world.

54. Over the past 20 years, The Absolute Sound ("TAS"), the largest high end Hi-Fi media company, has awarded more Product of the Year awards to Soulution than any other high-end Hi-Fi electronics brand.

55. Each generation of Soulution products has been widely regarded as one of the very best in their category. For example, the Soulution 727 preamplifier was named by TAS to be the "Preamp of the Year" when it was launched in 2024. The Soulution 757 phono amplifier was named by TAS to be the "Overall Product of the Year" in 2025 after its launch.

56. As relevant here, in January 2026, the Soulution 717 power amplifier was reviewed by TAS and featured on the cover of the magazine. The TAS reviewer and Executive Editor called it the most life-like solid-state amplifier he has heard and one of the best amplifiers ever.

57. In April 2026, AXISS's Soulution show room at the largest North America tradeshow, AXPONA, was awarded Best in Show by multiple reviewers as the best sounding room in the "cost no object" category. In July 2026, TAS selected the Soulution 717 for its annual Golden Ear award and selected the 717 to be the Overall Best New Hi-Fi Technology of the Year.

58. AXISS is the exclusive importer and distributor of Soulution products in the United States and the rest of North America. A true and correct copy of AXISS's contract with Spemot / Soulution, a contract originally entered into and still passively held by ADI, is attached to this complaint as **Exhibit 1**.

59. AXISS has invested substantial time and capital into promotion of all of its brands, including Soulution. For example, AXISS invested substantial time and capital to create its award-winning Soulution showroom at AXPONA.

60. That investment, coupled with the many awards and accolades for the Soulution products, poised Soulution for sales, revenue, and profit growth. But all of that ended abruptly because of Defendants' bad acts.

61. AXISS calculates that Defendants' actions have already cost AXISS and Soulution more than $2,000,000.00, a damages amount that grows by the day because of the ongoing reputational harm Defendants conspired to foist upon AXISS and its brands.

**Suncoast Contracts with AXISS While Luxury Competes with AXISS**

62. The Bovaird Defendants are competitors to AXISS who sell competing brands, including the Clarisys brand in which they have a significant financial interest.

63. Bovaird is an entrepreneur in Florida who owns and operates a number of Hi-Fi audio businesses. These businesses include Suncoast, Luxury, and Clarisys.

64. Luxury is an import and wholesale distribution business located in Sarasota, Florida that engages in substantially similar work to AXISS.

65. Luxury maintains substantial operations in Tennessee via Dave Weintraub, a Nashville-based employee who, on information and belief, leads up Luxury's sales in the United States.

66. On information and belief, many contracts for sales by Luxury are created in Nashville, Tennessee by Mr. Weintraub and are then sent to other states.

67. On information and belief, Bovaird engages with Mr. Weintraub on a regular basis via teleconferences and other means to perform Luxury business while Mr. Weintraub is present in Tennessee.

68. Luxury and AXISS compete directly against each other

(a) to win the exclusive distribution rights for high-end Hi-Fi products that they want to sell in North America;

(b) to sign up top Dealers to sell the brands that each company represents; and

(c) to sell the high-end Hi-Fi brands and products, via dealers, to the ultimate customers.

69. Luxury is the exclusive North American distributor for Clarisys Audio speakers, and a handful of other Hi-Fi brands.

70. Clarisys manufactures and sells high end Hi-Fi speakers made with a unique ribbon-style driver.

71. Bovaird and Wiegand have a financial interest in Clarisys. They are listed as co-managers of Clarisys by the Florida Secretary of State. On information and belief, Bovaird, either directly or through companies that he owns and controls, owns a 50% interest in Clarisys, and Wiegand owns the other 50%.

72. On information and belief, all United States sales of Clarisys products to Dealers are contracted through Luxury and handled by Dave Weintraub out of Tennessee.

73. Weintraub is, therefore, an agent of Clarisys.

74. Therefore, on information and belief, the management of the Clarisys Authorized Dealer network and all Clarisys United States sales are processed by an employee of Luxury in Tennessee who acts as Clarisys's agent.

75. As is the case with Luxury, on information and belief, most if not all contracts for sales of Clarisys products are created in Nashville, Tennessee by Mr. Weintraub and are then sent to other states.

76. Furthermore, on information and belief, Bovaird and Wiegand, the owners of Clarisys, regularly engage with Mr. Weintraub via teleconferences and other means to perform Clarisys business while Mr. Weintraub is present in Tennessee

77. Clarisys products have not won as many awards or accolades as Soulution products.

78. Suncoast is a retail Dealer of high-end Hi-Fi products located in Sarasota, Florida. Suncoast sells directly to consumers and represents a larger number of audio brands than Luxury.

79. Bovaird owns Suncoast.

80. Suncoast was an Authorized Dealer of AXISS that, until 2026, carried Soulution products as well as other products exclusively imported and distributed by AXISS.

81. To that end, Suncoast entered into an Authorized Dealer Agreement with AXISS. The agreement, which is signed by Bovaird with ADI, is dated April 23, 2023, which is after AXISS's current ownership had acquired ADI (effective January 1, 2023) and during the time ADI was being wound down as an operating company. In other words, Suncoast contracted with AXISS at a time Bovaird knew that AAU was the operating company being spun up to handle the operations of AXISS.

82. A true and correct copy of the Authorized Dealer Agreement (the "Agreement") is attached to this complaint as **Exhibit 2**.

83. Subsequent to signing the Authorized Dealer Agreement, Suncoast has contracted repeatedly with AAU via purchase orders for purchases of audio equipment, all of which are then accepted as invoices and become contracts under Tennessee law that Bovaird entered into on behalf of Suncoast in Tennessee and which AAU performed from Tennessee.

84. All told, Suncoast engaged in 11 different transactions with AAU totaling $275,907.40 with payments made to AAU via its bank in Tennessee and products shipped by AAU from Tennessee to locations requested by Suncoast. Bovaird executed each of these contracts.

85. AXISS has entered into similar Authorized Dealer Agreements with all of its authorized dealers.

86. AAU has entered into similar purchase order contracts, all of which are done under Tennessee law, from Tennessee, with its other Dealers.

87. The Bovaird Defendants and Gefteas Defendants are aware of AXISS's business relationships with its dealers. In fact, like most audiophiles, Defendants were aware that AXISS is the exclusive distributor of Soulution products in North America.

88. In the Agreement, Suncoast, among other things, agreed to adhere to specific trade practices and to make its best efforts to support any AXISS products it sells.

89. Specifically, in section 3.6 of the Agreement, Suncoast contracted to abide by certain trade practices:

> 3.6 **Trade Practices.** Dealer shall at no time engage in "bait and switch" practices or any other unfair trade practices with respect to the Products, shall make no physical, electrical or mechanical alterations to the Products without the advance written consent of the Company, shall make no false or misleading representations with regard to the Company or the Products, and shall engage in no activities which may reflect adversely upon the Company or the Products. Dealer shall make no representations to customers or to the trade with respect to the specifications, features or performance of the Products, except such as may be approved in writing or published by the company.

90. Among others, Suncoast promised not to "bait and switch" customers between products and to "make no false or misleading representations with regard to [AXISS] or the Products, and shall engage in no activities which may reflect adversely upon [AXISS] or the Products."

91. It bears emphasis that in the Agreement signed with ADI, Suncoast agreed not to engage in unfair practices "with respect to the Products"—that is, the products imported and distributed by AAU.

92. In Section 3.7 of the Authorized Dealer Agreement Suncoast agreed to:

> 3.7 **Best Efforts.** Dealer shall use its best efforts to promote and sell the Products and shall at all times represent the Products fairly in comparison with competitive products. If a customer inquires about a product which is competitive with any of the Company's Products carried by Dealer, Dealer shall describe and offer to demonstrate the features and benefits of the Company's Products so as to enable the customer to enjoy a full range of choice.

93. This was a material term of the Agreement. Specifically, since Suncoast not only sells but, in fact, has an owner (Bovaird) with ownership in (i.e. a conflict of interest in) Luxury (a competing importer / distributor), and an interest in Clarisys (a competing brand), it was

especially important that Suncoast agreed in 3.7 to "use its best efforts to promote and sell the Products and . . . at all times represent the Products fairly in comparison with competitive products."

94. Once again, in this contract Suncoast was making promises with regard to the products which are imported and distributed by AAU.

95. The Bovaird Defendants all have a material interest as competitors to AXISS and Soulution in seeking the diminishment of AXISS and its exclusive brands, such as Soulution and Gauder Akustik, while perpetuating the advancement of Luxury and its exclusive brands, especially Clarisys.

96. Given that competitive posture, Suncoast's contractual promises to make no misleading statements and engage in no activities reflecting adversely upon AXISS and its products (3.6), and to use its best efforts to represent the products fairly in comparison with other products (3.7), was especially important before AXISS would agree to do business with Suncoast.

97. Suncoast also acknowledged in Article 8 of the Agreement that AXISS does not warrant the products it imports and resells. Suncoast specifically acknowledged that AXISS gave Suncoast no implied warranties, and Suncoast acknowledged that AXISS is not liable for any damages because of products or parts defects.

98. Rather, warranties in the high-end Hi-Fi audio market are provided by the actual manufacturers of products. Typically a warranty requires the manufacturer to repair or replace any audio product that is damaged or does not otherwise operate as promised.

99. Refunds are not typically provided by manufacturers who instead typically repair or replace the product.

100. As the importer and distributor, AAU facilitates between Dealers like Suncoast and manufacturers like Soulution the repair and replacement of products.

101. Following Suncoast's breaches of the Agreement detailed below, especially Suncoast's material breach by conspiring with the Gefteas Defendants to defame, slander, and.or engage in misrepresentation and deceit about AXISS and its products, AXISS terminated the Agreement in late December of 2025, with an effective date of January 22, 2026.

**Gefteas Demands Compensation for Favorable Reviews**

102. A little after AXISS began to contract with Suncoast, AXISS began to work with Gefteas to seek reviews of AXISS and its products.

103. Gefteas is a full-time professional Hi-Fi product reviewer and social media influencer who operates as "The Greek Audio Geek" on Facebook, Instagram, and YouTube. He promotes his online influence with "25,000 strong followers" and touts his "engaging daily content and conversation" on his website.

104. Manufacturers and distributors pay Gefteas to review and promote their products and post comments on his Facebook and YouTube channels, knowing his influence in the high-end audio world. The reviews are directed at audiophiles all across the country with most if not all of these audio enthusiasts having a keen awareness of manufacturers, distributors, brands, and who carries exclusivity for certain brands.

105. Gefteas is aware of the companies AXISS distributes and has knowledge specifically of the relationship AXISS has with Soulution.

106. AXISS first worked with Gefteas in November of 2023. Gefteas reviewed AGS diffusor products imported and distributed by AXISS that were made by a company named Nihon Onkyo Engineering.

107. After completing the review, Gefteas contacted AAU in Tennessee, told TJ Goldsby, an AAU employee in Tennessee, that he really liked the AGS products, and asked if AAU would make it possible for Gefteas to find a way to keep the AGS products.

108. Gefteas thus personally and directly reached out to a AAU, a Tennessee-based company and engaged with employees in Tennessee to seek to enter a contractual relationship with that Tennessee-based company.

109. When Gefteas initiated contact and made an offer to a Tennessee-based company to enter into a contract made in Tennessee that was to be performed in large part in Tennessee, Gefteas purposefully availed himself of Tennessee's protection and legal benefits.

110. Since Gefteas's review had been favorable and led to a few new sales, AAU agreed to sell Gefteas the reviewed products for $5,916.60, which is a 62% discount to the $15,370.00 retail price Gefteas would otherwise have had to pay. AAU and Gefteas agreed that the nearly $10,000.00 discount was fair compensation for the review and promotion of the AGS products.

111. Gefteas's contract with AAU also necessitated a contract with Veris because Veris, not AAU, is the AXISS entity that sells directly to end users like Gefteas.

112. Therefore, Gefteas entered in an invoice order contract with Veris On June 15, 2024. This too was a contract Gefteas entered into in Tennessee with a Tennessee-based company whose performance took place primarily in Tennessee. A true and correct copy of the contract between Gefteas and Veris is attached hereto as **Exhibit 3**.

113. The contract between Gefteas and Veris acknowledges the AAU contract that Gefteas had already performed. It specifically notes, "Because customer did a great review of these products, AXISS Audio (i.e. AAU) has arranged for these to be sold to customer at a 62% discount to List Price, while also covering the costs of shipment and any payment processing fees."

114. The contract with Veris goes on to state that Gefteas needs to pay 50% now and the remaining 50% after 60 days.

115. As agreed in his contract with Veris, Gefteas paid the first 50% of that amount, $2,958.30, on July 5, 2024 and the remaining balance of $2,958.30 on August 27, 2024.

116. Gefteas made both payments to Veris's bank by transferring money to Tennessee.

117. That same August of 2024, Gefteas began a new review for AXISS on an Accuphase E-5000 integrated amplifier.

118. Gefteas contracted again with AAU for the review as AAU arranged for Gefteas to be loaned the equipment to conduct his review.

119. Gefteas benefitted from this arrangement. AXISS is a leader in the industry, as are the products it sells. By contracting with AAU and reviewing AXISS products Gefteas was able to legitimize himself as an influencer in the industry.

120. This was significant consideration AXISS provided to Gefteas via the many contracts that governed the relationship between Gefteas and AXISS.

121. Gefteas published the Accuphase review on both Facebook and YouTube in October 2024, and it was very positive and favorable for the Accuphase product.

122. After Gefteas completed the Accuphase review, he reached again reached out to Goldsby, an AAU employee located in Tennessee. Although neither AXISS nor Gefteas had discussed any compensation for Gefteas's Accuphase review above the loan of the equipment and association with AXISS's industry-leading reputation noted above, Gefteas told Goldsby that he did not think it was fair for him to not receive additional compensation because Gefteas's AGS review had led to a number of sales and he deserved to share more in that product's success. Gefteas then told Goldsby that he did not think it was fair that AXISS had required him to make

the final $2,958.30 payment on the AGS products he purchased. Gefteas proposed that AXISS (via Veris) should consider refunding that payment as compensation for the Accuphase E-5000 review and as a thank you for the success of the AGS review.

123. Goldsby agreed to discuss the idea with the AXISS management team and share feedback at a later date, but before Goldsby could finish that consultation, Gefteas emailed Goldsby in Tennessee and made a new proposal for a new contract. Gefteas proposed that AXISS send him an additional $10,485.00 of AGS products which he would then add to his system. Gefteas said he would do two follow-up videos about his AGS product experience, post un-boxing pictures on his Facebook page, and make additional postings to promote AGS. In exchange, Gefteas proposed to keep all of the additional AGS product for free as compensation for posting the new videos, pictures, and promotions of AGS products.

124. On information and belief, Gefteas accepts free products he receives for reviews, sometimes keeps these products for his personal use, and sometimes sells them directly or through intermediaries in order to make income for his promotional work.

125. On information and belief, Gefteas further enriches himself via Bespoke.

126. Gefteas started Bespoke at the beginning of 2026, in the middle of the events chronicled in this lawsuit.

127. Bespoke purports to be a consultation business. On information and belief, by consulting with buyers and then recommending certain dealers to sell equipment to the buyers he consults with, Gefteas is able to facilitate the sales of the products he receives for his reviews and promotions.

128. On information and belief, Gefteas uses Bespoke to refer business to Suncoast and for products imported and distributed by Luxury, including Clarisys which is owned by Bovaird and Wiegand.

129. In fact, Gefteas all but admitted he directs his customers to Suncoast on November 7, 2025 when he posted that Suncoast is one of only two dealers from which he purchases.

130. On information and belief, Gefteas is compensated for the buyer referrals he makes via Bespoke, including the referrals he makes to Suncoast and for products imported and distributed by Luxury, including Clarisys which is owned by Bovaird and Wiegand.

131. The Bovaird Defendants and Gefteas Defendants thus conspired to perform the events chronicled in this lawsuit in order to harm AXISS and enrich themselves.

132. The AXISS team concluded that Gefteas's ask for more than $10,000.00 of free products was outside of normal industry standards and that AAU should pass on Gefteas's proposed contract. But when Goldsby delivered that response back to Gefteas, he became angry, stated that he deserved to be paid more for his review work, and noted that AXISS's competitors were giving him free products for doing their reviews.

133. Gefteas then demanded the refund of the $2,958.30 second payment for the discounted AGS products. When Goldsby responded that the contract between AAU and Gefteas for the AGS deal had already closed out and there was no justification to renegotiate it, an enraged Gefteas told Goldsby that AAU must pay more for Gefteas to continue performing positive reviews for AXISS products.

134. AAU then decided it could consider some form of monthly sponsorship to support future work, but before negotiating that option, Gefteas told Goldsby that if he did not get a refund

of the $2958.30 that he would refuse to review Gauder Akustik speakers he had been loaned for review and no longer review any future products for AXISS.

135. Gefteas had received the Gauder Akustik speakers via another contact he entered into with AAU in October of 2024, whereby AAU agreed to loan the speakers to Gefteas as part of a product review, and Gefteas agreed to return them or pay for them. A true and correct copy of the contract between AAU and Gefteas over the Gauder Akustic speakers is attached hereto as **Exhibit 4**.

136. Once again, Gefteas contracted directly with AAU, a Tennessee-based company, that shipped products to Gefteas from Tennessee, and in the contract Gefteas promised to return the products to Tennessee or pay AAU in Tennessee. AXISS incurred about $1,000 in expense sending the speakers back and forth.

137. Gefteas did not fulfill this contract. He had agreed to review the Gauder Akustic speakers but did not.

138. When Gefteas was demanding the additional $2,958.30 cash payment from Goldsby, he also implied that it would be harmful for AXISS's reputation if the partnership ended on bad terms and pressured Goldsby to find some way to get that payment refunded. In other words, Gefteas threatened AAU via AAU's employee in Tennessee in order to demand payment from AAU or else face damaging internet posts. Gefteas was well-aware that a bad review of a product AXISS distributes is not only harmful to the manufacturer but also directly affects the distributor's reputation as audiophiles associate these exclusive distributors with the products they promote.

139. Pressured and intimidated as he was by Gefteas, and concerned about the damage that Gefteas had threatened to cause AAU and its products, Goldsby decided to enter into another contract with Gefteas.

140. Goldsby in his capacity as an AAU employee agreed to pay Gefteas $1,479.15 in exchange for Gefteas's promise to continue to review AXISS products and not disparage AXISS and its products, as Gefteas had threatened to do.

141. In other words, in response to Gefteas' offer (that he made by placing phone calls and sending emails into Tennessee) to not disparage AXISS in exchange for $2,958.30, Goldsby counter-offered $1,479.15, which Gefteas accepted. From his location in Tennessee, Goldsby personally made two cash payments equal to 25% of the amount that Gefteas was demanding ($1,479.15 in total) via Zelle.

142. Gefteas received those payments in consideration for his promise to continue to do reviews and to not disparage AXISS. AAU's employee in Tennessee negotiated the non-disparagement agreement from Tennessee; and the payments went from Tennessee to Gefteas through an account that belonged to Gefteas's wife.

143. AAU provided additional consideration in that the agreement for Gefteas to continue to review AXISS products and not disparage AXISS would help continue to legitimize Gefteas as an influencer and reviewer in the industry since AXISS is a leader in the industry, as are the products it sells.

144. But Gefteas breached his promise. Dissatisfied with the $1,479.15 payment, which he kept, Gefteas began to systematically criticize AXISS and its products, disparaging AXISS in violation of his promise not to do so.

145. In fact, Gefteas ultimately posted on May 12, 2026 about the Gauder Akustik speakers that he had refused to review that they are the “worst speakers” he ever heard, “absolutely lifeless, emotionally disconnected … I never had a positive impression of it in any way.”

146. So Gefteas broke his contract and disparaged AXISS and its product by calling one of AXISS’s brands as the worst he ever heard.

147. At the same time that he disparaged the Gauder Akustik product sold by AAU, Gefteas misrepresented facts and deceived viewers on his YouTube channel by suggesting he does not take compensation for reviews when he in fact had demanded and had been paid $1,479.15 from AAU’s employee and had previously received a 62% discount on AGS products in exchange for a positive review of them.

148. As alleged below, that negative review came during a time when Gefteas has been actively defaming and engaging in misrepresentation and deceit against AXISS and the products AAU imports and sells as part of the conspiracy involving the Bovaird Defendants and Gefteas.

149. Not long after Goldsby paid him $1,479.15, Gefteas immediately stopped writing positive reviews of AXISS and the products AXISS carries. To the contrary, Gefteas began to regularly and systematically criticize AXISS brands such as Soulution, Gauder Akustik, and Accuphase.

150. At the same time Gefteas criticized AXISS and its products, he praised the Bovaird Defendants, including Luxury and its products. For example, in just a four week period from August 11, 2025 to September 8, 2025, Gefteas praised and promoted the Bovaird Defendants and their products no less than 16 times in videos and on his Facebook page.

151. Likewise on November 7, 2025, Gefteas praised both Clarisys and Suncoast and noted that Suncoast is one of only two dealers that he buys from.

152. Meanwhile, Bovaird suggested in a public video posted in late January of 2026 that he gave away free Clarisys products to YouTube reviewers as a better form of marketing than advertisement.

153. Gefteas does his reviews on YouTube and has performed multiple reviews and promotions showing himself in possession of two expensive sets of Clarisys speakers.

154. Gefteas regularly claims that he receives no compensation for his reviews.

155. That claim is false, as shown by the payments and free products that Gefteas demanded and received from AAU and by Gefteas having told AXISS that AXISS competitors give him free products.

156. Moreover, given Bovaird's statement that he provides free product to YouTube reviewers and Gefteas's many positive reviews and promotional postings of the Bovaird Defendants and their products immediately following AAU's refusal to continue paying Gefteas, coupled with Gefteas's demand for over $10,000.00 in compensation from AAU for a positive review and package promotional postings, Plaintiffs plead on information and belief that the Bovaird Defendants have paid Gefteas in excess of $100,000.00 for positive reviews and promotions of their businesses and the products they sell.

**Suncoast Breaches the Authorized Dealer Agreement, and AXISS Fixes Suncoast's Customer Service Failure**

157. In October 2024, Suncoast submitted a purchase order and made deposits for one Soulution 727 preamplifier and two Soulution 717 power amplifiers. This was a "pre-order" of the newest Soulution products, some of which were in the final stages of development.

158. Suncoast effectuated these deals through three contracts.

159. First. Suncoast was able to purchase Soulution products from AXISS because it was an Authorized Dealer and had signed the Agreement with ADI referenced above. The Agreement binds Suncoast to certain contractual requirements as delineated above.

160. Second, Suncoast purchased the products from AAU via purchase orders that were then accepted as invoices, each of which was billed to Bovaird and was a contract completed in Tennessee under Tennessee law. A copy of the invoice for the 727 Preamplifier and demonstrating that the contract was made with AAU in Tennessee is attached hereto as **Exhibit 5**.

161. A copy of the invoice for the 717 amplifiers and demonstrating that the contract was made with AAU in Tennessee is attached hereto as **Exhibit 6**.

162. Suncoast paid the deposits to AAU at its bank account with First Horizon (formerly First Tennessee) Bank. A true and accurate copy of the $60,000 deposit paid to AAU in Tennessee is attached here to as **Exhibit 7**.

163. Bovaird personally arranged and personally approved payment and other terms of the deal.

164. Suncoast subsequently made payments to AAU's account at First Horizon in Tennessee on December 9, 2024 ($24,835.63) and June 13, 2025 ($86,471.26). True and accurate copies of those additional payments made to AAU in Tennessee are attached hereto as **Exhibits 8 and 9**.

165. The 727 shipped in late 2024 from Tennessee and was installed in December at the home of a customer in Malibu, California whose online name is PK-LA.[2] The 727 worked without any problems, and PK-LA said it was the best preamplifier he had ever used in his system.

[2] To protect the personal privacy of the customer, Plaintiff refers to this customer by his online name, PK-LA. The name and identity of the customer is well-known to all Defendants as detailed by their many statements and actions alleged in his lawsuit.

166. The Soulution 717 amplifier became available to ship in June 2025.

167. Suncoast asked AAU to arrange for the 717s to ship directly from the Soulution factory to PK-LA.

168. That request led to a third contract between Suncoast and AAU.

169. Bovaird placed phone calls and sent text message to AAU employee TJ Goldsby. Bovaird personally promised Goldsby (as representative of AAU) that Suncoast had agreed to coordinate with PK-LA and to assist him with installing the 717 amplifiers, once they arrived.

170. In reliance upon Bovaird's promise to ensure that the installation would be handled by Suncoast, AAU agreed to ship the 717 amplifiers directly to PK-LA and provided Suncoast with shipping details and tracking numbers.

171. But Bovaird did not keep his promise. Suncoast breached its agreement with AAU and PK-LA and failed to travel to California to support its customer with the installation.

172. Assistance with installation, especially for a high-end product like the Soulution 717s is a common service provided by dealers in the industry and expected for any retail sale above $100,000.00. That was particularly true here where AAU arranged for the products to be shipped directly to the customer in reliance upon Suncoast's promise that it would handle the installation.

173. Altogether Suncoast engaged in four contracts as part of the PK-LA transaction:

(a) First, Suncoast was able to place an order because of the Agreement between ADI (a company with its principal place of business in Tennessee) and Suncoast, which obligated Suncoast as an Authorized Dealer to certain requirements as alleged above and below.

(b) Second, Suncoast contracted with AAU in Tennessee to purchase the 727 preamplifier.

(c) Third, Suncoast contracted with AAU in Tennessee to purchase the 717 amplifiers.

(d) Fourth, Suncoast and Bovaird contracted with AAU in Tennessee to get AAU to ship the 717 amplifiers directly to PK-LA's home in California in exchange for Suncoast's promise to travel to California and arrange for the installation.

174. When neither Bovaird nor anyone from his Suncoast team showed up to assist in California, PK-LA attempted to set up and install the Soulution 717 amplifiers himself starting on or around July 1, 2025.

175. On July 2, 2025, PK-LA called Cliff Duffey and informed him that, at some point during the installation and setup of one of the Soulution 717s, a speaker binding post had broken in half. This rendered that amplifier unit inoperable and in need of repair: a standard issue covered by warranty. Duffey told PK-LA that AXISS would arrange to have that repaired.

176. Other than the broken binding post, at that time AXISS was not aware of any issues with the Soulution products or PK-LA's setup.

177. On July 5, 2025, Bovaird personally contacted AAU in Tennessee informed AAU that there was another problem with the Soulution products in PK-LA's possession.

178. On information and belief, problems with the products arose because of Suncoast's failure to properly install the products, according to its contract obligations with AAU and its obligations under the Agreement with ADI.

179. Bovaird and Suncoast breached their contractual promise to install the Soulution products, upon which AAU had relied.

180. The Agreement specifies that AXISS offers no implied warranties and excludes all claims for damages by Suncoast except to repair or replace products at AXISS's option.

181. The reason for these limitations is that warranties in the high-end Hi-Fi audio market are provided by the actual manufacturers of products. These warranties require the manufacturer to repair or replace any audio product that is damaged or does not otherwise operate as promised.

182. In breach of the Agreement and against industry practice, Suncoast never gave Soulution (or AAU) a reasonable period of time to analyze the products for fault or to repair or replace the product.

183. To the contrary, on July 5, 2025, Bovaird texted TJ Goldsby of AAU and told him that the sale to PK-LA would have to be undone.

184. In other words, the first time AAU heard of a possible issue other than on the amplifier with the broken post came in the form of a demand that it take all of PK-LA's Soulution products back—not that it repair or replace them as the Soulution warranty provides.

185. Bovaird advised Goldsby that AAU needed to take the products back from Suncoast and provide a refund to Suncoast even though they had not been shown to have any defect. Bovaird implied that AXISS would suffer severe legal and reputational harm if it did not immediately agree.

186. The demand was a complete shock to AAU as there had been no inquiry to AAU for support of a possible product defect or fault on either of the two Soulution products that PK-LA was continuing to use.

187. After some back and forth, Bovaird informed AXISS, via Cliff Duffey, that PK-LA's Rockport Lyra speakers had been damaged.

188. The Rockport Lyra speakers are not an AXISS product.

189. Although it was too early at this stage to know the cause of such damage, Bovaird put the blame on Soulution products and failed to provide any support to PK-LA or AAU to investigate the actual cause of the damage to PK-LA's speakers. In doing so, Bovaird in his role with Suncoast, violated Sections 3.6 and 3.7 of the Agreement.

190. Although Bovaird demanded an immediate refund, Cliff Duffey and Steve Huntley of AXISS informed Bovaird that AXISS would need to determine if there was anything wrong with the Soulution products and if they had actually caused damage to PK-LA's speakers before considering the best remedies.

191. On July 15, 2025, Bovaird, Duffey, Huntley, and PK-LA met at PK-LA's house to identify the root cause of the speaker damage.

192. Huntley intended to do on-site testing of the audio equipment and speakers, but that was not possible because PK-LA had dismantled his system and packed up the Soulution products. AAU therefore shipped the Soulution products to Nashville, Tennessee for testing.

193. After extensive testing, all of which was conducted in Tennessee, which included connecting PK-LA's Soulution products to AAU's own pair of Rockport Lyra speakers (replicating the exact system set up in PK-LA's house), and streaming music at a high volume for 50 hours, playing the exact album PK-LA was listening to, AAU was able to confirm that the Soulution products were not at fault for damage to PK-LA's speakers.

194. While AAU was able to rule out the Soulution products, AAU could not do testing with PK-LA's other components to identify if one of those had caused the damage, or if PK-LA's Rockport speakers had a defect.

195. AXISS informed Bovaird and PK-LA on July 30, 2025 that testing had confirmed the Soulution products did not cause the damage to PK-LA's speakers.

196. At the same time AAU was testing the Soulution products, Bovaird was actively asking AAU for more Soulution products, including 717s and 727 for him to sell to customers.

197. Suncoast had no right to a refund.

198. Bovaird could have taken those products back from PK-LA and sold them to another client.

199. Any repair needed would have been performed under warranty, which is the standard remedy, after which Bovaird could resell the products.

200. There was no need for a refund.

201. But Bovaird did not take the Soulution products back. He insisted that AAU refund him the price and take the products back.

202. Incredibly, while Bovaird was insisting upon a full refund, he was also inquiring about availability of these same products for Suncoast to purchase and sell to their other interested customers. So instead of Suncoast reselling the returned PK-LA products for a substantial profit, Bovaird demanded rescission of the purchase order contracts with AAU and that he receive a remedy that was outside of Suncoast's Agreement with ADI.

203. The next business day following the refund, Bovaird called Cliff Duffey in Tennessee and offered to enter into a new contract with AAU in Tennessee. Bovaird asked to re-purchase the returned products at a substantial discount to the amount of the refund.

204. AAU declined to accept Bovaird's offer for this new contract. Duffey informed Bovaird that there was a backlog of other Soulution dealers with deposits who had already asked if they could purchase the returned products and that they could not be sold back to Suncoast for a discount. This greatly enraged Bovaird who then told Cliff Duffey that he had already had

customers who were expecting to purchase those from Suncoast based upon AAU selling them back to Suncoast at substantial discounts.

205. On July 15, 2025 Duffey, Huntley Bovaird, PK-LA and his girlfriend, and Ron Resnick (a friend of PK-LA) met at PK-LA's house and a nearby restaurant to address PK-LA's concerns.

206. PK-LA stated that he wanted Suncoast to take back the Soulution products and give him a full refund. PK-LA also stated that his personal privacy is essential because of personal security reasons and wished for this to remain confidential.

207. All parties agreed to keep the details of PK-LA's purchase, experience, and transaction confidential.

208. In reliance upon Bovaird and Suncoast's promise to keep things confidential, AAU agreed to consider a refund to Suncoast so as to help Suncoast and PK-LA and began negotiations.

209. But as AAU considered what it would do, while at the same time testing the Soulution products for fault, Bovaird threatened AXISS with reputational harm if it did not give a refund.

210. Bovaird made these threats even though Suncoast contracted in section 8 of the Agreement that it does not have a warranty or claim for damages against AXISS.

211. Bovaird stated that PK-LA would sue AXISS and cause AXISS reputational harm if it did not issue a full refund.

212. This was untrue. PK-LA never threatened to sue AXISS and in fact stated that he wished to avoid a lawsuit.

213. Later, long after AAU issued a refund, the Bovaird Defendants repeated the lie that PK-LA was considering legal action against AXISS. That has never been the case.

214. Even though one 717 amplifier was quickly repaired under warranty and the other was found to not have faults, AAU eventually agreed to take back the 717 amplifiers and give Suncoast a full refund. As for the 727 that PK-LA had been using since December of 2024, AAU agreed to take that back and refund its price too minus a standard industry restocking fee, given that it had been in use for eight months.

215. Even though Suncoast had no claim for a refund—and indeed Suncoast was at fault for breach of its contractual promise to perform the installation itself—Bovaird was enraged that AAU would charge an industry-standard restocking fee.

216. Ultimately, on August 1, 2025, AAU, Suncoast, and PK-LA agreed that AAU would refund Suncoast for the 717s and refund Suncoast for the 727, minus the restocking fee, and Suncoast would in turn refund PK-LA the full amount for the 717s and the price of the 727 minus the AAU restocking fee.

217. There was, therefore, a fourth contract between AAU and Suncoast (a fifth contract, counting the contract with ADI), executed by Bovaird, by which AAU agreed to wire money to Suncoast and PK-LA was a third-party beneficiary who would receive that same sum from Suncoast. Confidentiality was a key part of this transaction. Bovaird personally agreed to keep this contract with AAU confidential.

218. Once again the parties all agreed that confidentiality was essential. AAU relied upon Bovaird / Suncoast's promise of confidentiality in agreeing to this refund that is contrary to industry practice and which AAU had no contractual obligation to give.

219. PK-LA, Bovaird, and AAU were the only parties that knew of the August 1, 2025 refund agreement at the time the parties entered into it.

220. On August 1, 2025 AAU sent a wire from Tennessee to Suncoast to complete the agreed upon refund. Suncoast, in turn sent a refund to PK-LA.

**The Bovaird Defendants Slander AXISS to its Dealers**

221. Immediately after the refund, Bovaird and Wiegand began to slander AXISS. They did this despite having just learned that testing showed the Soulution products had not harmed PK-LA’s speakers.

222. In early August, 2025, Wiegand in his role as owner and manager of Clarisys, and as part of a conspiracy among all the Bovaird Defendants traveled to Colorado and slandered AXISS by telling an AXISS dealer in Colorado that an amplifier had destroyed a customer's speakers and that AXISS had refused to give a refund.

223. Though three companies together do business as AXISS, Wiegand’s slander was directed toward “AXISS” rather than specific AXISS entities because the entities that comprise AXISS are generally known as AXISS in the industry.

224. Wiegand did this intentionally in order to interfere with AXISS's relationship with its dealer and AXISS's relationship with Soulution.

225. It was in Clarisys's business interests to try to discredit Soulution.

226. Wiegand could not have known of the PK-LA situation unless Bovaird breached his promise of confidentiality.

227. And to the extent Wiegand knew about the PK-LA situation from Bovaird, then he knew or should have known that the Soulution products did not cause the problem because the testing was complete and had already been reported to Bovaird.

228. On information and belief, Wiegand and Bovaird conspired to share the false information Wiegand conveyed to the dealer in Colorado.

229. That same Colorado dealer was later told by Bovaird that a 717's circuit boards "had solder dripping off them" which caused a short circuit in one of PK-LA's amps.

230. Solder is a metal alloy used in some circuit boards that, if used incorrectly, can cause a circuit board to break.

231. This was false, and Bovaird knew it was false, because AAU had just provided Bovaird with photos of the circuit boards showing that the boards were made with no solder used on the underside of the circuit boards and that there was no solder defect. Bovaird as an expert would know that it would be not be possible for these circuit boards to have a solder defect.

232. Later that same month, Wiegand was in Utah repairing a broken pair of Clarisys speakers.

233. AXISS's dealer was present with Wiegand and the customer.

234. When the customer told Wiegand he had a strong interest in Soulution 717s, Wiegand told the customer not to buy 717s because they were defective and had blown up a customer's speakers. Again, Wiegand knew or should have known that these statements were false.

235. Based on Wiegand's false story, that customer chose not to buy any Soulution products.

236. This action is an injurious falsehood perpetrated by Wiegand in his role as owner of Clarisys upon the property of AAU and Soulution.

237. Later, Dave Weintraub, a sales representative of Luxury and Clarisys who works in Tennessee placed a phone call from Tennessee to that same Utah dealer and told the dealer he should drop Soulution products because the 717 was defective and blowing up speakers.

238. On information and belief, Weintraub was provided this false information by either Bovaird or Wiegand (or both).

239. On information and belief, Weintraub did not know that his employers told him false information.

240. On information and belief, Weintraub was instructed by either Bovaird or Wiegand (or both) to call the Utah dealer and spread the false information and took that action in his role as an employee of Luxury and on behalf of Clarisys, a company for which he handles all United States sales (via Luxury) from Tennessee.

241. In other words, an employee of Luxury who works as an agent of Clarisys in Tennessee, on instructions from his employer, from Tennessee slandered, misrepresented, and deceived a dealer about the Soulution products sold by AAU.

242. Mr. Weintraub did this in his role as an employee of Luxury and agent of Clarisys at the direction of Bovaird and/or Wiegand.

243. Mr. Weintraub took these actions from Tennessee for the purpose of obtaining more sales for Luxury of Clarisys products.

244. Mr. Weintraub's actions, which were performed in his role as an employee of Luxury and agent of Clarisys, were an injurious falsehood that injured the property of AAU and Soulution.

245. AXISS learned about these conversations because its dealers called it to ask about the Bovaird Defendants' false allegations.

246. Wiegand's statements were false. The Soulution amplifier did not destroy PK-LA's speakers. Nor was it true that AXISS would not give a refund since AAU did give a refund. (And the refund to PK-LA, ultimately, was the responsibility of the dealer, Suncoast.)

247. Bovaird breached his promise of confidentiality upon which AAU relied when it engaged in negotiations for a refund.

248. But these instances of slander and intentional interference with AAU's business relationships were just the first of many by the Bovaird Defendants.

**The Bovaird Defendants Slander and Defame AXISS in the Audio Industry**

249. The Bovaird Defendants slandered and defamed AXISS and engaged in misrepresentation and deceit to Jay Caceres, on Audioshark, and at the Florida Audio Expo.

250. These actions were in violation of the Agreement and the law.

251. Through these actions the Bovaird Defendants intentionally interfered with AXISS's business relationships with its dealers, Soulution, and customers.

*Jay Caceres*

252. On information and belief, the Bovaird Defendants slandered and defamed and engaged in misrepresentation and deceit against AXISS to Jay Caceres.

253. Caceres is the owner and operator of Jay's Audio Lab, a business that does reviews of high-end Hi-Fi products, provides private consultation to individual buyers for a fee, directly sells high-end Hi-Fi equipment, and brokers the sales of high-end Hi-Fi equipment to third parties for a fee.

254. Caceres is one the largest social media influencers in the high-end Hi-Fi space with over 40,000 YouTube followers, 1,400 followers on Instagram, and 1,700 subscribers on Facebook.

255. Caceres also does substantial business with the Bovaird Defendants by buying products from the Bovaird Defendants to sell to his customers, arranging consignment sales of used products for the Bovaird Defendants, and brokering new buyers that he brings to Suncoast.

256. On information and belief, on or about August of 2025, Bovaird knowingly slandered AXISS to Caceres by telling Caceres the same false story Bovaird and Wiegand were

telling AXISS dealers about the speakers. Bovaird did so knowing that Caceres had a large platform in the industry and that this disparaging information would harm AXISS's reputation and business.

257. Caceres, having heard this false story, then later talked two customers out of buying Soulution products.

258. As alleged below, Caceres admitted these facts on a YouTube show on May 10, 2026.

*Audioshark*

259. Bovaird operates and owns Audioshark, a members-only online forum for discussion of high end Hi-Fi products.

260. On information and belief, Bovaird has defamed AXISS and engaged in misrepresentation and deceit by sharing false stories about the PK-LA situation and Soulution speakers with members on Audioshark.

261. On information and belief, Bovaird has slandered AXISS by telling false PK-LA facts to members of Audioshark.

*Florida Audio Expo*

262. Bovaird owns and operates a for profit annual industry tradeshow call the Florida Audio Expo.

263. At the annual show from February 20-22, 2026, Bovaird hosted a large Clarisys demonstration room in which he personally demonstrated products.

264. During the show, Bovaird regularly told customers who came to his demonstration room the false story that Soulution 717 amplifiers had damaged PK-LA's speakers and that AXISS and Soulution was knowingly shipping defective products and covering up the truth.

265. AXISS learned this from a Soulution client who was told these claims directly from Bovaird and was now concerned about how these claims could affect the value of the Soulution products he had recently purchased.

**The Bovaird Defendants Conspire with the Gefteas Defendants to Defame AXISS and Engage in Misrepresentation and Deceit in Violation of Law and Contracts**

266. In addition to the defamation and slander they engaged in directly, the Bovaird Defendants slandered and defamed AXISS to Gefteas.

267. Bovaird's statements to Gefteas were in violation of the Agreement, as well as his contract completed on August 1, 2025 promising confidentiality as to the PK-LA situation.

268. During the negotiations with PK-LA, the day before the deal was finalized, Gefteas teased the story with a "Greek Coded Cryptic Message" stating, "Remember your reputation and taking care of a customer is more important than being 'right' if you are to stay in business." He responded to comments on the post stating, "In this case—which I will not talk about publicly—it's pretty shocking behavior by the distributor and manufacturer. Even in my jaded world it's like they took extra-stupid pills." *See* 7/31/25 posting, attached as **Exhibit 10.**

269. At the time Gefteas made this teaser, only three people (PK-LA, Cliff Duffey, and Bovaird) had knowledge of the ongoing negotiations that were soon to culminate in a contract for a refund.

270. Ron Resnick had not participated in the discussions about the refund and was not aware of the agreement that the parties were about to reach.

271. Interestingly, just before Gefteas made this post, Bovaird told Cliff Duffey that if AAU did not give a full refund PK-LA would go public about the situation on the What's Best Forum.

272. On August 1, 2025, approximately two hours after the final closing of the PK-LA transaction—and at a time when no one knew of the PK-LA transaction except AXISS, PK-LA, and the Bovaird Defendants—i.e. Ron Resnick had no knowledge—Gefteas posted to all of his followers that the expensive amp blew up and ruined expensive speakers, the amp company has a "history of defective products" and that the distributor tried "to stick it to the owner" and refused




to do the right thing.

273. Gefteas continued to post comment after comment to his first post further adding false and misleading statements and misrepresentations about AXISS that deceived readers.

274. All of this was in violation of his contract to not disparage AXISS.

275. While Gefteas didn't explicitly name either AXISS or Soulution, the highly experienced and specialized subscribers and viewers of The Greek Audio Geek social media pages could only have understood that Gefteas was referring to AXISS and Soulution because of the way Gefteas described the products and the parties involved. For example, he mentions a "six-figure system failure" and that the distributor is located in the United States (AXISS is the exclusive distributor of Soulution in North America). Gefteas also later posted a picture of a "failed amp" and any audiophile familiar with the industry would have recognized that product as the Soulution 717. The post explicitly targets both the brand and the distributor, which is consistent with how audiophiles view the industry—a problem with the brand is a problem for the exclusive distributor of the brand.

276. Gefteas could have only gained information about the PK-LA deal from the Bovaird Defendants as no one was privy to that information except for Bovaird, PK-LA and those associated with AXISS.

277. When the Bovaird Defendants, especially Suncoast, shared such information with Gefteas they engaged in activities that reflect adversely upon AXISS in violation of the Agreement.

278. When the Bovaird Defendants, especially Bovaird and Suncoast, shared such information with Gefteas they violated the confidentiality agreement of the August 1, 2025 refund agreement.

279. On that same August 1 date, in comments and responses to his original post, Gefteas amplified and added detail to his false narrative by calling the distributor (AXISS), "greedy," "stupid," and "arrogant." He claimed that the distributor could have made the customer whole but instead "chose to make the customer lose a substantial sum of money." He then added, "Honestly this would be a fantastic project as a case study in Business School of everything not to do. If I

didn't personally know the players in this, I would not believe what I've heard as I frankly can't believe anyone is that stupid." Gefteas directed these comments at AXISS customers across the country, including in Tennessee, as this group of followers is very aware of the players in the market, their locations, and their exclusive brands.

280. All of these disparaging comments were in breach of Gefteas's contract to not disparage AXISS.

281. These disparaging comments also violated the Tennessee Consumer Protection Act.

282. Gefteas continued to add more and more responses to the original post. Claiming that the amp blew up and damaged the customer's $250,000 speakers, Gefteas repeated the false claim in comments that the company's products "have a long history of repeatedly failing." He even went so far as to state that the "blow up" was witnessed by another person and "there may be injuries as well."

283. He boldly states, "I know the full circumstances. There were multiple witnesses and possible physical injuries as well." This implies that Gefteas was getting the details from someone involved, which could only have been Bovaird at this time.

284. Several times, Gefteas refers to the customer as a "victim" implying that AXISS, as the sole distributor of this brand, took advantage of or even hurt this individual. This false narrative viewed through a series of posts directly targeted both AXISS and the brand, Soulution, and was understood as such by the audiophile community.

285. Despite his familiarity with the industry and knowledge that any refund, if issued, was between the customer and the dealer (Suncoast), not the distributor, Gefteas repeatedly misled readers and stated that the distributor did not make the customer whole. For example, he wrote,

"Remember—being a bad or good distributor is a conscious and calculated choice each makes on its own. In this instance they chose the path this took. They could have easily made this very easy and chose not to."

286. None of the comments or posts mentioned the dealer, Suncoast, at all, even though the transaction was ultimately between Suncoast and the customer. *See* Comments to 8/1/25 Facebook posting, attached as **Exhibit 11.**

287. The posts and comments were purposefully deceitful, false and misleading because AXISS did in fact provide a refund to Suncoast, despite not having any obligation to do so, but any refund to the customer was solely a matter for the dealer, Suncoast.

288. Further, the Soulution amplifiers did not blow up and were proven to not have caused damage to the customer's speakers. The customer's 727 preamplifier and 717 power amplifier were thoroughly inspected, analyzed, and tested with the same model of speaker as the customer's for over 50 consecutive hours high volume use. Throughout all of this testing, AXISS proved that PK-LA's 727 preamplifier or 717 amplifiers had not caused damages to PK-LA's speakers. It was also confirmed through testing that none of PK-LA's Soulution products had "blown up" and there were no physical injuries or victims either.

289. The Bovaird Defendants orchestrated the public release and publication of this false information in violation of the Agreement and the August 1, 2025 refund contract.

290. Gefteas knew or should have known that these statements related to the PK-LA situation, the products, and AXISS were false because, as someone knowledgeable about this industry, Gefteas would have known that a refund, if given in part or in full, would be from the person the customer contracted with—i.e. the dealer—and not the distributor.

291. Gefteas also knew or should have known that the amps distributed by AXISS did not blow up, there were no victims, and that there was no evidence to support the claim that the amplifier destroyed the customer's speakers.

292. In fact, Gefteas was receiving this information from Bovaird and conspiring with Bovaird to publish a false and disparaging narrative.

293. Gefteas knew or should have known that AXISS was not responsible for this incident and did nothing to "stick it to the customer" or engage in any type of unethical business practice.

294. Gefteas had worked with Bovaird, promoting his products for pay, and knew or should have known that it was Bovaird and Suncoast, not AXISS, who could have made the customer whole but chose not to. After all, Gefteas could only have found out the details of this entire situation from Bovaird himself.

295. The posts stating that AXISS "stuck it" to the customer and made a conscious choice to not "do the right thing," engaged in unethical and poor customer service, did not refund a customer, and knowingly sold faulty equipment is significantly and seriously damaging to AXISS's reputation as a small business with a tightknit and knowledgeable community as a customer base. As evidenced by the damages in this case, the reputation in this industry and the reliability of equipment is essential to any future sales.

296. All of these highly damaging and disparaging comments violated Gefteas' contractual obligations to AAU and the Tennessee Consumer Protection Act.

297. Gefteas knew Duffey and others at AXISS and had plenty of contacts in the industry to find out more about the PK-LA transaction or to inquire about details regarding the refund, whether the Soulution amplifiers were actually the cause of customer's speaker damage and if

there was any truth to claims of the amplifier blowing up or causing physical harm. Upon information and belief, Gefteas did not bother to confirm or verify any details and instead only relied on the self-serving story provided by the Bovaird Defendants and/or fabricated his own story about the incident.

298. After seeing several false and defamatory posts and comments, Ron Resnick, who had been involved with helping trouble-shoot PK-LA's speakers but who was not a part of and did not know of the August 1, 2025 refund agreement until after Gefteas began posting, with PK-LA present and witnessing, called Gefteas on August 3, 2025 to make sure Gefteas understood that his claims were not accurate and based on false information, and that PK-LA did not want his story to be made public and falsely used for ulterior motives.

299. In other words, ever since August 3, 2025 Gefteas has known that his posts are false, and yet he has persisted in making post-after-post repeating the falsehoods and misrepresentations and engaging in deceit and amplifying the false and deceitful narrative even more by continuing to post and ensuring that anyone who had not seen the original posts now had an entire thread of posts to follow.

300. All of this is in violation of Gefteas's contractual obligations to AAU and the Tennessee Consumer Protection Act.

301. Despite this explicit warning by someone directly involved in the transaction, Gefteas intentionally ignored what he then knew to be false and continued posting about AXISS failing to provide a refund to an unhappy customer, as well as false statements about the Soulution 717 amplifier blowing up, causing harm, and damaging that customer's speakers. Gefteas also did not delete any of his false and defamatory comments, including those where he stated that he knew all of the circumstances, or even posts stating that there were physical injuries.

302. This purposeful and deceitful conduct misled Gefteas' audience of audiophiles and significantly damaged AXISS reputation and its reputation as the exclusive dealer of Soulution brands.

303. AXISS is the exclusive supplier to Authorized Soulution Dealers in North America, and the consistent false and defamatory posts about product defects and poor support by AXISS has led to a significant decrease in sales. In fact, sales of the disparaged Soulution products dropped over 88% from the start of the defamation until the filing of this lawsuit.

304. The false and defamatory statements have caused a number of AXISS's Authorized Soulution Dealers to drop the Soulution brand and have impeded the ability of AXISS to add new dealers for Soulution and other AXISS brands as new dealers don't want to represent what has been publicly called a defective product or associate or affiliate themselves with a distributor with a poor reputation.

305. The reputational damage has also hampered AXISS's ability to sell other brands or to gain new brands for distribution. Other brand representatives have called AXISS inquiring about the false statements and have expressed hesitation in doing business with AXISS because of the reputational harm.

306. These harms to AXISS are a direct result of the actions of the Bovaird Defendants and Gefteas, who conspired together to engage in this smear campaign.

307. In February of 2026, Gefteas again posted false and defamatory information about AXISS, implying that AXISS had lost AIRTIGHT, a key brand, because of AXISS's poor reputation and customer service. In fact, to the contrary, AXISS and AIRTIGHT ended their thirty year successful partnership amicably for a variety of business reasons. AIRTIGHT notified its

dealers and customers through a gracious letter announcing the change. *See* AIRTIGHT Letter, attached as **Exhibit 12.**

308. Instead of posting the exact letter, Gefteas posted a doctored version of the letter with several words and lines of text missing. *See* Altered Letter, attached as **Exhibit 13.** The Altered Letter omitted many positive references to AXISS and AIRTIGHT's statements about its appreciation of the partnership with AXISS. Then, after publishing a false, doctored letter Gefteas then added a post about how this brand chose to switch distributors to leave a distributor (AXISS) who had less care, knowledge, and respect for the craft. *See* Feb 9 post, attached as **Exhibit 14.**

309. Once again Gefteas used the initial post as a means to post reply after reply disparaging AXISS, including a return to the false and misleading PK-LA allegations.

310. The post clearly implied that AXISS had less care, knowledge and respect for the craft and because of its actions and/or reputation, AIRTIGHT decided to part ways. There was nothing in the post that indicated that the letter was not authentic, again misleading viewers into believing that the letter was genuine.

311. A few days later, Gefteas, in response to a post from Ron Resnick calling out the Altered Letter as false, stated that Resnick called him months ago about a significant situation involving AXISS and Soulution. Gefteas stated that the situation caused him to be glad he did not own Soulution gear and gave him reservations about AXISS. Gefteas went on to state that the fact that AIRTIGHT moved away from AXISS suggests that there were legitimate issues with AXISS. Again, Gefteas didn't suggest that the letter he posted was doctored in any way or that he was doing anything but trying to imply that the relationship ended due to AXISS's conduct and/or reputation.

312. Once again, in making these false and disparaging comments Gefteas breached his contractual obligation to not disparage AXISS and violated the Tennessee Consumer Protection Act.

313. Gefteas didn't hold back this time. Instead of just calling out a "distributor", he named AXISS and Soulution explicitly. This now gave the public confirmation of who was involved, for those who did not already know from the previous posts, and provided incentive for those not familiar with the first false narrative to look at Gefteas' previous defamatory posts for more information.

314. Again, Gefteas was well-aware at this point that the speakers did not blow up and did not cause damage to the speakers, that there were no injuries, and that AXISS, the distributor, was not responsible for the refund to the customer. Gefteas also was aware, as it was in the public domain, of the reasons for the AXISS and AIRTIGHT separation as stated in the original letter, which was widely distributed.

315. Gefteas knew or should have known that the information above was false and defamatory, but he posted it anyway to thousands of people, all of whom are potential customers.

316. These statements damaged AXISS's ability to sell not only Soulution products but also other brands as all of these defamatory statements eroded AXISS's reputation in the industry.

317. About a week after Gefteas's misleading and disparaging AIRTIGHT letter and follow on comments, in an effort to try and repair its reputation, AXISS publicly posted two explanations detailing what occurred with the PK-LA incident. *See* AXISS posts, attached as **Exhibit 15.**

318. PK-LA even published his own public account of what occurred—a narrative that did not include a story of the 717 amplifiers blowing up or any injuries. PK-LA also stated that

AXISS had done testing on his exact Soulution products in a near replica of his system and could not reproduce what he had experienced. *See* PK-LA post, attached as **Exhibit 16.**

319. Once again, Gefteas received information regarding the dispute directly from the parties involved, including the customer himself. Despite having this information, Gefteas did not amend or delete any prior posts or comments even though he knew at this point that the posts were false and defamatory and that they would be widely viewed by audiophiles across the country.

320. Not only did not he not revisit his prior posts, Gefteas continued to promote these false and defamatory statements, directing them to the audio enthusiast community.

321. In May of 2026, Gefteas claimed he was getting messages from Soulution customers with failing solution amps. He wrote, "This predates the recent issue where an owner went public about his brand new six-figure Soulution system failed after only an hour and supposedly took out his $250,000 speakers." *See* May post, attached as **Exhibit 17.** Again, referencing the past posts with the same hashtags led readers again to the trail of prior defamatory posts, making them relevant and visible again, and harming AXISS and Soulution again.

322. In comments to this post, Gefteas discussed a Soulution amp and referenced a US distributor, knowing AXISS is the only U.S. distributor of Soulution products. He commented, "It's too bad the customer here in the US with his failure of the brand new units mentioned above was never made financially right by the US distributor (so say people in the know). I can't imagine doing that to a customer if true. Imagine not giving him 100 percent of his money back immediately?" *See* May comments, attached as **Exhibit 18.** Gefteas made these comments despite knowing that it was Bovaird's Suncoast Audio, the dealer, who decided to not give the customer a full refund.

323. As the comments went on, he got bolder: "Cliff Duffy at Axiss CHOSE to NOT REFUND the owner of the new gear that damaged the Rockports (speakers) all his money back. The owner had to threaten to sue at the dinner table he took them to and at that only got SOME of this money back. Ask Cliff about the admission he made at dinner regarding the known quality of parts used in Soulution. Ask Cliff why he didn't refund the buyer 100% of his money after the near immediate failure. Any other reputable company would have immediately." *See* Comment, attached as **Exhibit 19.**

324. The comments again perpetuate the false, defamatory, and misleading narrative which could only have come from the Bovaird Defendants, as they were the only ones at the "dinner table" not affiliated with AXISS or PK-LA.

325. These comments misrepresent AXISS and deceive the audio community about AXISS.

326. These comments disparage AXISS in violation of Gefteas's contractual obligation and the Tennessee Consumer Protection Act.

327. This further illustrates that a conspiracy exists between the Bovaird Defendants and Gefteas.

328. These comments also illustrate the breach of the Agreement by the Bovaird Defendants who consistently engaged in activities that reflect adversely upon AXISS.

329. These comments further illustrate Bovaird's breach of the August 1, 2025 refund agreements requirement of confidentiality.

330. Incredibly, a few days later, Gefteas was back at it again. He wrote: "However when something so expensive fails within a day of receiving it (and damages other gear), an honest

reputable distributor would simply apologize and return 100% of the purchase price to the victim." *See* comments, attached as **Exhibit 20.**

331. These false statements were picked up by other large influencers and Youtubers in the audio community and caused direct harm to AXISS.

332. Again, Gefteas made these statements over and over again with full knowledge that Suncoast, not AXISS, chose not to fully refund the customer and that the incident as described had in fact, not happened at all.

333. For example, on May 10, 2026, Jay Caceres stated that he shared these stories with two interested Soulution buyers who then decided not to purchase sets of Soulution products.

334. At face value, this means AXISS lost at least two sales because of Caceres convincing customers not to buy.

335. On information and belief, Caceres did this because of false information provided to him and/or published to the world by Defendants.

336. Thus, Gefteas's false and deceitful posts caused injury to AAU's property, the Soulution products.

337. As recently as June 24, 2026, Gefteas posted a YouTube video where he again reiterates that a customer's equipment blew up and a US Distributor (AXISS) failed to give him one hundred percent of his money back. *See* YouTube video, available at, Facebook is BLACKMAILING Content Creators - A Real Life Example #Hi-Fiaudio.

338. The allegation that a Soulution amplifiers "blew up" and caused damage to speakers is false, and Gefteas knew it.

339. This telling and retelling of this false narrative, despite knowing the actual facts involved, is severely damaging to AXISS's reputation, especially considering Gefteas's audience with specialized knowledge.

340. The reputational harm is immense, as Gefteas claims to have direct knowledge of intimate conversations and claims that AXISS is dishonest, did not make a customer whole, and is engaged in unethical business practices.

**Defendants Intentionally Interfere with AXISS's Business Relationships**

341. AXISS has valuable relationships with its dealers, the brands it imports and distributes, and the end customers who support the dealers and brands (and thus AXISS) through their purchasers.

342. These dealers and brands are all known to Defendants.

343. The Bovaird Defendants know the dealers because they work with many of the same dealers to sell their products, including Clarisys.

344. The Bovaird Defendants also know the dealers because they try to bring the dealers on as dealers of their products.

345. The Defendants know AXISS's brands because they are published on the AXISS website and discussed regularly by publications in the audio industry.

346. Defendants set out to systematically interfere with or even destroy AXISS's business relationships.

347. For example, both Wiegand (himself and on behalf of Clarisys) and Bovaird (himself, and on behalf of Luxury and Clarisys) defamed and slandered AXISS repeatedly to its dealers and engaged in misrepresentation and deceit.

348. Wiegand and Bovaird intentionally and repeatedly slandered the Soulution 717s and caused injury through falsehood to AAU and Soulution's property.

349. Gefteas repeatedly defamed both AXISS and Soulution, while also disparaging other AXISS brands like Gauder Akustik and engaged in misrepresentation and deceit about AXISS

350. Bovaird shared confidential information with Gefteas and Wiegand which they each published.

351. Bovaird and Wiegand gave false information to and instructed Dave Weintraub, Luxury's employee and Clarisys's agent, to spread false information and misrepresentation and deceit.

352. Gefteas and Bovaird each tried to intimidate AXISS to pay them money, give free product, or issue refunds.

353. Together, all of these acts were improper motives and means designed to interfere with AXISS's business relationships and destroy it as a competitor to Luxury and its brands as competitors to Clarisys.

354. Together these acts caused injury to AAU and Soulution's property.

355. These improper means were effective and caused a dramatic drop in sales, especially for the Soulution 717s and Gauder Akustik speakers which dealers are refraining from purchasing from AXISS, thus interfering with both the dealer relationships and the distributor relationship with Soulution and Gauder Akustik.

**Defendants Conspire to Harm AXISS and Benefit Themselves**

356. Moreover, this was all part of a conspiracy.

357. Bovaird, Wiegand, and Gefteas, together with the entities they control, all agreed to work together to defame and slander and engage in misrepresentation and deceit against AXISS

and its products and interfere with AXISS's business relationships for the express purpose of destroying AXISS so as to benefit themselves and their companies.

358. Bovaird is at the center of the conspiracy.

359. Bovaird shared confidential information with Wiegand and Gefteas which they could have obtained only from Bovaird.

360. Gefteas then published false information based on the confidential information from Bovaird and engaged in misrepresentation and deceit that caused harm to AXISS and its property.

361. All the while Bovaird compensated Gefteas through free or reduced products and other means. In exchange for this compensation, Gefteas repeatedly published false information and continued to do so even when others, including PK-LA and Ron Resnick, told him that what he was saying was false.

362. Gefteas benefits from the payments Bovaird makes to him and from the business he does with Bovaird and Bovaird's entities (Suncoast, Luxury, and Clarisys) both directly and through his sole proprietorship, Bespoke.

363. Bovaird, Wiegand, and their entities all benefitted by harming sales of Soulution products, especially the 717s and Gauder Akustik and other AXISS products, thereby increasing the market for Clarisys products and other products imported and distributed by Luxury and sold by Suncoast.

364. Luxury and Clarisys participated directly in the conspiracy, in Tennessee, via the actions of Dave Weintraub, Luxury's employee and Clarisys's head of sales in the United States.

365. The purpose of the conspiracy was to harm AXISS, Soulution, Gauder Akustik, and other AXISS brands while benefitting Defendants, a goal that the conspiracy achieved.

**AXISS and Soulution Suffer Substantial Damages**

366. Defendants' actions have profoundly damaged AXISS and have also caused damage to Soulution within the exclusive territory that AXISS controls.

367. When AXISS compares the four-month period during the summer of 2025 when the Soulution 717s were first released (i.e. 2nd and 3rd quarter of 2025) to the sales that have taken place since Defendants began their conspiracy (i.e. 4th quarter of 2025 and 1st and 2nd quarters of 2026), AXISS sees a sales decline of 88.4% on Soulution 717 amplifiers.

368. This is a shocking, unheard of, and precipitous drop in sales, especially considering the awards and accolades that the Soulution 717 was receiving during that time.

369. It is a drop in sales unprecedented in the industry for a product of this type.

370. And yet it happened to a product that most of the industry has declared to be one of the greatest audio products of all time.

371. There is no explanation or reason for this to have happened but for Defendants' illegal acts and conspiracy.

372. In fact, but for the systematic conspiracy of the Bovaird Defendants and Gefteas, AXISS would have expected to see an increase in sales of 717s as the stellar reviews and awards led to sales growth and adoption in the industry, rather than the precipitous decline AXISS observed.

373. Soulution too expected to see an increase in its sales but instead suffered a catastrophic decline in expected sales. Veris as assignee of Soulution's claims for damages in the United States and Canada seeks recovery of Soulution's damages, in addition to those suffered by AXISS, regarding the Soulution products.

374. And AXISS's sales of other products have also been impacted in an amount to be show in discovery and at trial.

375. For example, sales of Gauder Akustik products—the same product Gefteas refused to review, demanded payment after receiving, then trashed as the "worst ever" speakers in violation of his contract with AAU when AAU refused to pay him even more—are down over 70% in 2026 coincident with Gefteas's defamation, misrepresentation, and deceit and Bovaird's slander of AXISS.

376. Moreover, the ongoing damages to AXISS's reputation as a distributor are profound and of a quantity and value to be proven at trial. For example, AXISS has missed out on multiple dealer relationships and

377. Altogether AXISS pleads at least $1,800,000.00 in damages on the Soulution products alone, which is a figure that grows every day given the ongoing repercussions of Defendants' illegal acts.

## I. COUNT ONE

### Breach of Contract (ADI and AAU Against Suncoast and Bovaird)

378. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

379. AXISS in the form of ADI and AAU entered into five valid contracts with Suncoast of which Suncoast has breached three.

380. These contracts include the Authorized Dealer Agreement, the two sales of Soulution products related to the PK-LA transaction, the promise by Suncoast made by Bovaird that Suncoast would perform the installation of PK-LA's Soulution products, and the August 1, 2025 refund agreement requiring confidentiality.

381. Suncoast breached the Agreement in multiple ways, as alleged above, including Sections 3.7, 3.7, and 8, by engaging in activities that reflect adversely upon AXISS, failing to promote AXISS brands equally with other brands, such as Clarisys, and demanding a refund despite having explicitly agreed that it was not entitled to a warranty or damages.

382. Suncoast breached the agreement to install PK-LA's system when it failed to travel to California and perform the installation.

383. Suncoast and Bovaird personally breached the confidentiality provisions of the August 1, 2025 refund agreement.

384. It was reasonably foreseeable at the time the contracts were entered that a breach of the contracts would cause consequential damages.

385. AXISS suffered direct damages from the PK-LA situation on account of Suncoast's breaches.

386. AXISS has suffered consequential damages from Suncoast's breaches the contracts, including by Bovaird acting in his capacity as the owner and manager of Suncoast and in his personal capacity with regard to the breach of the promise to install PK-LA's products and to his breach of his promise of confidentiality for the PK-LA discussions and refund, a promise upon which AXISS relied.

## II. COUNT TWO

### Breach of Contract (AAU Against Gefteas)

387. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

388. AXISS in the form of and AAU entered into a valid contract with Gefteas.

389. This contract was for the Gefteas to continue to review AXISS products and not disparage AXISS or its products.

390. Gefteas breached the contract by failing to review AXISS products and repeatedly disparaging AXISS and its products.

391. It was reasonably foreseeable at the time the contracts were entered that a breach of the contracts would cause consequential damages.

392. AAU suffered direct damages on account of Gefteas's breach.

393. AAU has suffered consequential damages because Gefteas's breach.

## III. COUNT THREE

### Defamation (AAU Against Gefteas)

394. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

395. Beginning in July of 2025 and continuing to the present, Gefteas began posting and commenting on social media about AXISS and Soulution. The posts and comments falsely discussed the PK-LA situation by stating that AXISS did not provide a full refund to PK-LA, did not provide acceptable customer service to PK-LA, and sold PK-LA a defective amp which blew up, damaged his speakers, and caused injuries. While some posts and comments did not name AXISS directly, it provided enough context to the audiophile audience that most knew Gefteas was talking about AXISS. Tbe defamation was of and concerning AXISS. Further, Gefteas later began directly naming AXISS, defaming it and providing clarity for any subscribers who did not know AXISS was the target of the early posts.

396. This story involving the refund, injuries, and a blown up amp were false. AXISS did provide a refund to Suncoast and Suncoast was the party responsible for the refund to PK-LA

as AXISS was not the dealer involved in the transaction. The amp did not blow up or cause any injuries.

397. At the time Gefteas made these posts and comments, all detailed above, he knew or should have known that the statement was false.

398. At minimum, Gefteas failed to use reasonable care to determine the truth or falsity of the statements.

399. Gefteas intentionally chose to make these posts and the posts and comments were meant to be understood and were understood to be defamatory and disparaging to AXISS.

400. Based on this series of posts and comments, AXISS suffered serious damages to both its reputation to its sales, of at least $1,800,000.00.

401. Gefteas's actions and conduct were directed at injuring AXISS's reputation.

402. Gefteas took these actions personally and in his role as sole proprietor of Bespoke so as to benefit Bespoke.

403. Gefteas acted knowingly, intentionally, recklessly, and with the intent to injure AXISS, thereby entitling AXISS to punitive damages.

## IV. COUNT FOUR

### Defamation and Slander (AAU Against the Bovaird Defendants)

404. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

405. In August of 2025, Wiegand, as manager of Clarisys, traveled to Colorado and told an AXISS dealer in Colorado that an amplifier had destroyed a customer's speakers and that AXISS had refused to give a refund.

406. Bovaird then repeated that same false statement to the same dealer in Colorado.

407. A few days later, Wiegand again stated these same false statements to an AXISS dealer in Utah.

408. This fabrication that speakers were destroyed and AXISS had refused to give a refund was false.

409. Yet Bovaird repeated it again and again.

410. First Bovaird repeated the false statements to Jay Caceres.

411. Then he repeated the false statements to members of Audioshark.

412. Finally he repeated the false statements to visits to his demonstration room at the Florida Audio Expo.

413. Wiegand and Bovaird knew or should have known that these statements were false. After all, they were aware of the test results and Bovaird had spoken with the customer himself.

414. At the very least, Wiegand and Bovaird recklessly made these statements without using reasonable care to determine the truth or falsity of this information.

415. This impulsive and false story told directly to dealers in Utah and Colorado, then to Caceres, then to posters on Audioshark, and finally to visitors to the Florida Audio Expo was meant to be understood and was understood by the dealers and customers to be defamatory and disparaging to AXISS.

416. Based on false statements, AXISS suffered reputational damage.

417. Wiegand and Bovaird's actions and conduct were directed at injuring AXISS's reputation as they knew that the information was defamatory and would be understood as defamatory.

418. As a direct and proximate result of this fake fraud story, AXISS suffered significant reputational damage with its dealers and suffered from a loss of sales.

419. Luxury and Clarisys engaged in defamation and slander through their agents Bovaird, Wiegand, and Dave Weintraub, including through actions Weintraub took in Tennessee.

420. The defamation and slander was all directed toward Tennessee to cause harm to Tennessee companies.

421. The Bovaird Defendants, Wiegand and Clarisys acted knowingly, intentionally, recklessly, and with the intent to injure AXISS, thereby entitling AXISS to punitive damages.

## V. COUNT FIVE

### Intentional Interference With Business Relationships (All Plaintiffs Against All Defendants)

422. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

423. AXISS enjoys existing business relationships with its dealers, its product manufacturers, and—indirectly through its dealers (and directly in a limited capacity via Veris)—and with the end customers who buy the products AXISS imports and distributes.

424. Each of the Defendants have specific knowledge of AXISS's business relationships. Defendants are all aware of AXISS's dealers including through direct business they do or consider doing (Luxury, Clarisys, Bespoke), competition with them (Suncoast), meetings and interactions with them (Bovaird, Wiegand, and Gefteas), and general knowledge about them.

425. Each of the Defendants has specific knowledge of AXISS's business relationships with its product manufacturers such as Soulution and Gauder Akustik because these relationships are exclusive to AXISS, listed on AXISS's website, profiled in media such as TAS, and otherwise generally known in the industry. Defendants also know AXISS's products because they compete with those products for sales.

426. The Defendants each intended to cause interference with AXISS's relationships with its dealers and product manufacturers.

427. The Defendants each, either directly or via their owners, managers, and agents acting on their behalf used the improper means of defamation, slander, misrepresentation, deceit and misuse of confidential information for the predominant purpose of causing injury to AXISS, the products it carries, and its property for the purpose of enriching themselves.

428. Veris also brings this claim as assignee of Soulution and seeks damages for Soulution's losses in the United States and Canada on account of Defendants' intentional interference with Soulution's business relationships.

429. AXISS and Soulution have been damaged by Defendants' actions.

## VI. COUNT SIX

### Civil Conspiracy (Against All Defendants)

430. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

431. Defendants engaged in a common design to work together to harm AXISS as a business so as to improve their own business interest.

432. Each Defendant had the intent to engage in this common design and the knowledge of each other Defendant's common design.

433. The common design that the Defendants all engaged in was to accomplish, by concerted action, the unlawful purpose of intentional interference with AXISS's business relationships, injurious falsehood causing damages to AAU and Soulution's property, and/or the lawful purpose of gaining business through the unlawful means of defaming, slandering, misrepresenting, and engaging in deceit against AXISS and the Soulution products.

434. This common design was achieved through the overt acts alleged above including sharing (false) confidential information, publishing defamatory statements, slandering AXISS, engaging in misrepresentation and deceit against AXISS and Soulution, injuring AAU and Soulutions' property, and otherwise intentionally interfering with AXISS's and Soulution's business relationships.

435. Veris also brings this claim as assignee of Soulution and seeks damages for Soulution's losses in the United States and Canada on account of Defendants' conspiracy.

436. The conspiracy has caused damage to AXISS, Soulution, and their products.

## VII. COUNT SEVEN

### Injurious Falsehood (AAU and Veris as Assignee Against Gefteas)

437. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

438. Gefteas intentionally posted false information about the Soulution amps, claiming that they were defective, blew up, and caused injuries.

439. The amps were manufactured by Soulution and were the property of Soulution until transferred to AXISS, as the exclusive distributor.

440. Gefteas posted this disparaging information about the amp, knowing that this information was false and misleading and/or in reckless disregard for its truth or falsity.

441. Gefteas made these disparaging and false posts knowing that it would likely result in financial harm to both Soulution and AXISS, as the exclusive distributor of Soulution products because customers would not be interested in property owned by either Soulution or AXISS if there was concern that the products could be defective or harmful.

442. Indeed, the disparaging posts about the amps caused significant pecuniary harm to both Soulution ad AXISS.

443. This claim is brought on behalf of both AXISS (specifically all three AXISS entities) and by Veris as assignee of Soulution's claim.

## VIII. COUNT EIGHT

### Injurious Falsehood (AAU and Veris as Assignee Against Bovaird Defendants)

444. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

445. Wiegand told a Colorado dealer that amps distributed by AXISS destroyed a customer's speakers and yet, AXISS refused to provide a refund. Weigand also told a customer in Utah not to buy Soulution speakers because they were defective and had blown up a customer's speakers.

446. Weigand made these false statements to the Colorado dealer and customer in Utah knowing that the information was false and misleading and/or in reckless disregard for its truth or falsity.

447. Weigand made these false statements knowing that it would likely result in financial harm to Soulution and AXISS through loss of customer revenue as well as through damaging AXISS's relationship with Soulution.

448. In addition, Mr. Bovaird told the same Colorado dealer that a 717's circuit boards had solder dripping off them which caused a short circuit in some amps which caused speakers to blow up.

449. Bovaird made these false statements to the Colorado dealer knowing that AAU had provided him with pictures to show that this was false.

450. Bovaird made these false statements knowing that it would result in financial harm to AXISS and Soulution.

451. At or around the same time, Dave Weintraub, a sales representative of Luxury and Clarisys told that same Utah dealer that he should drop Soulution products because the 717 was defective and blowing up speakers.

452. Dave Weintraub made these false statements to the Colorado dealer either knowing that the information was false and misleading and/or in reckless disregard for its truth or falsity and/or at the instruction of Bovaird or Wiegand (or both) in his role as an employee of Luxury and agent of Clarisys.

453. Weintraub made these false statements knowing that it would likely result in financial harm to Soulution and AXISS.

454. Weigand and Weintraub made these statements in their roles as representatives and agents of Clarisys.

455. This claim is brought on behalf of AAU and by Veris as assignee of Soulution's claim.

## IX. COUNT NINE

### Violation of Tennessee Consumer Protection Act (Against Gefteas)

456. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

457. Gefteas, through his numerous Facebook posts, consistently and intentionally disparaged Soulution products as well as its exclusive North American distributor, AXISS.

458. By claiming that the amps were defective, blew up, and injured people and claiming that AXISS "stuck it to the customer," engaged in unethical business practices, and did not refund

the customer, Gefteas intentionally misled a community of audiophiles, all of whom are potential customers.

459. These false and misleading representations of fact disparaged Soulution and AXISS and constitute unfair or deceptive acts or practices under the Tennessee Consumer Protection Act. Tenn. Code Ann. § 47-18-104(a)(8).

460. These deceptive acts resulted in a significant loss of revenue for both Soulution and AXISS and has also caused monetary harm through the effect on both of their reputations. Tenn. Code Ann. § 47-18-109(a)(1).

461. This claim is brought on behalf of both AAU and by Veris as assignee of Soulution's claim.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court empanel a jury to try this action and enter judgment in its favor and against Defendants, jointly and severally as permitted by law, and award the following relief:

462. On the claims for breach of contract, civil conspiracy, and injurious falsehood, compensatory damages according to proof, including consequential damages;

463. On the claims for defamation, slander, and intentional interference with a business relationship, damages according to proof as well as punitive damages;

464. On the claim of violation of the Tennessee Consumer Protection Act, compensatory damages as well as treble damages and attorney's fees, as permitted under the Act;

465. Joint and several liability against all conspirators;

466. Pre- and post-judgment interest to the fullest extent permitted by law.

467. Costs of suit;

468. Such other and further relief as the court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 1, 2026.

Respectfully submitted,


/s/ *Eric G. Osborne*______________________
Eric G. Osborne, BPR No. 029719
Amy R. Mohan, BPR No. 031238
Sherrard Roe Voigt & Harbison, PLC
1600 West End Ave., Suite 1750
Nashville, TN 37203
Tel.: (615) 742-4200
eosborne@srvhlaw.com
amohan@srvhlaw.com

*Counsel for Plaintiffs VERIS HOME TECHNOLOGY LLC by itself and as assignee of SPEMOT AG, AXISS AUDIO USA LLC, and AXISS DISTRIBUTION INCORPORATED (together d/b/a AXISS AUDIO)*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all attorneys of record registered on the CM/ECF system. All other parties will be served by electronic mail and/or FedEx. Parties may access this filing through the Court's electronic filing system.

Peter Robison
**Lewis Thomason, P.C.**
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Tel: (615) 259-1343
probison@lewisthomason.com

*Counsel for Defendants Michael Bovaird,*
*Suncoast Audio LLC, Luxury Hi-Fi Distribution LLC,*
*and Clarisys Audio Global Distribution LLC*

Eric C. Lyons
**Buchalter**
1 Music Circle South, Suite 300
Nashville, TN 37203
Tel: (615) 986-3736
elyons@buchalter.com

*Counsel for Defendant Michael Gefteas*

Florian Wiegand
Winkelstrasse 345
4234 Zullwil
Solothurn, Switzerland

*/s/Eric G. Osborne*